# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00278-CR

**Joe Millian, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
### NO. 3021521, HONORABLE FRED A. MOORE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found Joe Millian guilty of indecency with a child by both exposure and contact in separate incidents with two children, T.F. and C.C.. Tex. Pen. Code Ann. § 21.11(a) (West 2002). The district court assessed terms of imprisonment for thirty-five years for the contact offenses and fifteen years for the exposure offenses. Appellant contends that the evidence is legally and factually insufficient to support the convictions. We will affirm the judgment.

**Background**

Appellant was convicted of indecency with T.F. and C.C., the daughters of family friends. In 2000, T.F. stayed overnight on several occasions with appellant and his then-wife, Judith Ronkartz, who was T.F.'s mother's college roommate. There was testimony that during these visits appellant slept in bed with T.F. while both were naked, rolling on top of her and placing her on

himself somewhere between his chest and his crotch. There was also testimony that he was sexually aroused by showering naked with T.F. These incidents were not reported to authorities until much later.

In 2002, appellant offered to keep C.C. at his home for a weekend to help his friend, Joe Coppedge, who was C.C.'s father and appellant's friend. There was testimony that appellant got into bed with C.C. at his home, licked her nipples, and grabbed her crotch and, when returning C.C. home, required her to remain with him in his car while he urinated into a urinal cup in the parking lot of her father's apartment complex.

**Elements of the offenses**

The offense of indecency with a child requires that the victim be younger than 17 years and not the perpetrator's spouse. A person commits indecency with a child by contact by engaging in sexual contact with the child. Tex. Pen. Code Ann. § 21.11(a)(1) (West 2002).[1] Sexual

---

[1] Section 21.11 of the penal code was amended in 2001. Act of May 23, 2001, 77th Leg., R.S., ch. 739, § 2, 2001 Tex. Gen. Laws 1463. The amendments applied only to offenses occurring after September 1, 2001. *See id.* Thus, the amendments apply to the offenses against C.C. that occurred in 2002 but not those against T.F. that occurred in 2000. Most of the changes were non-substantive. *See id.* The one change that could apply concerns the definition of "sexual contact" for purposes of the offense of indecency with a child. *Id.* The amendment added the following language to Section 21.11:

> In this section, "sexual contact" means the following acts, if committed with the intent to arouse or gratify the sexual desire of any person:
>
> (1) any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child; or
>
> (2) any touching of any part of the body of a child, including touching through clothing, with the anus, breast, or any part of the genitals of a person.

contact is "any touching of the anus, breast, or any part of the genitals of another person with intent to arouse or gratify the sexual desire of any person." *Id*. § 21.01 (West 2002). A person commits indecency with a child by exposure by exposing his anus or any part of the genitals with the intent to arouse or gratify his sexual desire knowing that a child is present. *Id*. § 21.11(a)(2)(A)**.**

**Standards of review**

In conducting a legal sufficiency review, we ask whether, after viewing all the evidence in the light most favorable to the adjudication, any rational trier of fact could have found the essential fact beyond a reasonable doubt. *See Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); *Griffin v. State*, 614 S.W.2d 155, 158-59 (Tex. Crim. App. 1981); *Skillern v. State*, 890 S.W.2d 849, 879 (Tex. App.—Austin 1994, pet. ref'd). We do not realign, disregard, or weigh the evidence. *Rodriguez v. State*, 939 S.W.2d 211, 218 (Tex. App.—Austin 1997, no pet.). The trier of fact has the responsibility of weighing all the evidence, resolving evidentiary conflicts, and drawing reasonable conclusions from the evidence. *Garcia v. State*, 57 S.W.3d 436, 441 (Tex. Crim. App. 2001). The jury can draw reasonable inferences from basic facts to ultimate facts. *Melton v. State*, 120 S.W.3d 339, 342 (Tex. Crim. App. 2003).

When conducting a factual sufficiency review, we consider all the evidence, including the testimony of defense witnesses and the existence of alternative hypotheses. *See Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). A factual sufficiency review asks whether a neutral review of all the evidence, both for and against the finding of guilt, demonstrates that the

---

*Id*. (codified at Tex. Pen. Code Ann. § 21.11(c)). For ease, we will simply cite to the current statute.

proof of guilt is so obviously weak or so greatly outweighed by contrary proof as to undermine confidence in the jury's determination. *See Zuniga v. State*, No. 539-02, 2004 WL 840786 at *4 (Tex. Crim. App. Apr. 21, 2004); *Johnson*, 23 S.W.3d at 11. As in a legal sufficiency review, we must defer to the jury's determination of what weight to give contradictory testimonial evidence because resolution often turns on an evaluation of credibility and demeanor, an evaluation better suited for jurors who were in attendance when the testimony was delivered. *Johnson*, 23 S.W.3d at 8. It is the jury's prerogative to reject all or part of the evidence and draw reasonable inferences from the evidence presented. *Clewis v. State*, 922 S.W.2d 126, 135 (Tex. Crim. App. 1996).

**Testimony**

Several witnesses testified about the two incidents, including the two children, a parent/outcry witness for each child, and appellant.

When T.F. testified at the April 2003 trial, she was nine years old. She last visited appellant's house in the summer of 2000. She testified that she initially liked visiting appellant and his wife, Judy. She said she had her own room, but that somebody slept with her. She testified that, although she wore pajamas at home, she wore nothing at appellant's house. She said that she did not like it when appellant took off her pajamas. She said that, when appellant slept with her, he would either roll on top of her or roll her on top of him. When she was on top of him, her head would be on his chest. She did not like feeling his chest hair. She testified that, although she knew how to bathe herself and did so when Judy helped her, appellant washed her when he showered with her. On the stand, she denied having told anyone previously that he washed her private area or that,

4

when they slept together, she felt the hair from his private area touching her private area. She admitted to being scared on the stand and scared when she told her mother about the incidents.

Renee Sims, the mother of one of T.F.'s friends, testified that T.F. had an unusual reaction regarding a cookout at appellant's house. Sims's daughter and T.F. were playing together at Sims's house. Sims testified that, when she told her daughter and T.F. that they were going to a cookout at appellant's house, Sims's daughter was excited, but T.F. started crying and said she did not want to go. T.F. then told Sims some disturbing information that Sims passed along to Helen Taylor, T.F.'s mother; Sims did not testify before the jury regarding the content of the disturbing information.

Taylor testified that she was good friends with appellant and his wife, Judith Ronkartz, her college roommate. They would keep T.F. overnight when her and her then-husband were working long hours. She said T.F. liked going to appellant's house because they lived in the country and had animals. (For ease of reference, we will call appellant's home "the farm.") Taylor testified that T.F. slept with her at home and wore a T-shirt or a nightgown. She testified that the cookout was planned for July 29, 2000. Taylor said that T.F. told her that, at the farm, appellant would make her sleep with him at night without her pajamas on. T.F. told her that sometimes T.F. had to sleep on top of him, which she did not like because she did not like the hair in his private area touching her privates. T.F. also told Taylor she did not like having to sleep on her stomach while he rubbed her back, she did not like being held down, and did not like "where certain parts touched her." Taylor testified that T.F. reported that she did not like having to take showers with appellant at night and again in the morning. Taylor said that, when she confronted appellant over the phone,

5

he said that he did not make a big deal about going around the house naked. She testified that, after the reports, T.F. acted out and had trouble sleeping, and that the problems recurred as the trial approached.

Judith Ronkartz, appellant's wife at the time of the incident with T.F., testified that at first T.F. slept in the bed with both her and appellant. Ronkartz testified that T.F. wanted to sleep between them, but that appellant chose to sleep in the middle. Appellant later decided that T.F. needed to sleep in a different room. T.F. was initially afraid to stay by herself, so either appellant or Ronkartz would lie in that bed until T.F. fell asleep, then return to the master bedroom. Ronkartz said that appellant decided who would sleep with T.F. and that there were "bad" consequences if Ronkartz deviated from his plan; Ronkartz did not elaborate in her testimony regarding what those consequences were. She said that T.F. wore a T-shirt and underwear when Ronkartz slept with her, but that she did not know what she wore with appellant. Ronkartz said that T.F. took baths when she started staying with them and that she was able to bathe herself, but that they sometimes helped her bathe, especially when she was younger. Later, appellant decided that T.F. should shower with him and he instructed Ronkartz to pretend that she was asleep. Ronkartz testified that on one occasion she heard T.F. crying, then heard appellant call her a crybaby and saw him walk out of the bathroom with an erection. Ronkartz testified that she did not report the incident because she was afraid for her personal safety and that of T.F.; shortly thereafter, Ronkartz moved out, warned Taylor not to take her child out to the farm, and divorced appellant.

C.C., nine years old at the time of trial, testified that appellant was her father's friend. She spent the night at appellant's farm. She said she was afraid to sleep in the other room by herself,

6

so she agreed to sleep with appellant. C.C. said he removed her T-shirt, licked her nipples, and told her about doing the same to T.F. She never met T.F., whose pictures were on appellant's refrigerator. C.C. testified that, while they were in bed, appellant grabbed her private area that she pees with. She tried to move his hand away, but "it wouldn't go away." She said she stayed awake until about 5 a.m. because she hoped that in the morning he would stop. The next day, appellant took her shopping and bought her some clothes, which made her feel good. Then, back at the farm, he made her try on her new clothes in front of him, which she did not like. When she put on a tight pair of pants, he smacked her butt, which scared her. That night, he removed her dress and again licked her nipples. She testified that he was wearing a T-shirt and maybe some shorts when this occurred. C.C. also testified that appellant rubbed her arms and legs a lot. She said that, when appellant parked near her father's apartment, he peed in a cup before letting her out of the car. She looked away and did not see any body part, although she could tell that urine came out of appellant's body. When she got into her father's apartment, she told him what appellant had done.

C.C.'s father, Joe Coppedge, testified that appellant had been very helpful to him when he had health, financial, and personal problems. After Coppedge was assaulted by his wife and wife's boyfriend (in C.C.'s presence) and shortly thereafter served with divorce papers, Coppedge and C.C. were nervous. Appellant suggested that Coppedge's son and C.C. spend the weekend at his farm so Coppedge could focus on answering the divorce papers. Appellant's car was too small to take both kids (appellant lent his truck to Coppedge to run errands), so he suggested that he could take C.C. and that the son stay and help Coppedge, and the two of them could join C.C. at the farm when they were ready. Coppedge had forgotten to pack clothes for C.C., but appellant told

7

him not to worry because he had clothes left over from T.F. and they would go shopping for others. Coppedge did not know T.F. or her family, but appellant talked about her often. Coppedge said that he had an unusual conversation with appellant on the phone after the second night C.C. stayed with him. Appellant seemed hyper and compared C.C. to T.F. quite extensively, and emphasized how much better behaved C.C. was than T.F. Appellant wanted her to stay another night, but C.C. said she wanted to come home right away; that, more than the strangeness of appellant's conversation, made Coppedge think something was wrong. When C.C. returned home, she almost immediately went to a friend's house, and appellant stayed and talked more about C.C.'s good behavior. Appellant expressed concern that she was not well because she did not sleep well. Coppedge testified that, for about a month around the time of the incident, C.C. had ear infections and a cough, but was well enough to go to school. Appellant also talked about getting her to return and about hosting Coppedge's son.

Shortly after appellant left, C.C. returned and told Coppedge about the weekend. She told Coppedge that appellant touched her private area and licked her nipples. He said that C.C. was fairly matter-of-fact about it, but seemed relieved to tell the story. He said that they had discussed generally what was acceptable behavior after an incident in the apartment swimming pool in which a boy was yanking on her swimsuit. Coppedge said he considered that she could be mistaken or lying, but her story was too specific and she had reasons (like appellant's monetary help) not to tell such a story. He already had a meeting scheduled with a victim-witness counselor because of the assault on him, but also talked with the counselor about what his daughter told him. (The counselor testified at trial, confirming his report.) He testified that C.C. seemed fine, but soon began needing

8

to be around him more and not wanting to be around other men—particularly bossy men. She also became very embarrassed and angry that her father had told other people about the incident.

Coppedge testified that they continued to see appellant about half a dozen times after the incident because a detective advised him not to confront appellant. C.C. hid in the bathroom once. Another time, she hid under the covers when appellant tried to play with her; when she was not responsive, he apologized to her, saying, "[P]eople make mistakes." Appellant continued to help them, however, until Coppedge confronted him about the incident with C.C.

Dr. William Lee Carter, a psychologist specializing in abuse cases, testified about behaviors associated with such cases. He said that children exhibiting these behaviors were not necessarily abused, and that as many as one-third of such allegations were false.

Travis County Detective Nancy Zimmerman testified that appellant admitted sleeping naked with T.F. He said he usually slept naked, and said that T.F. asked to sleep naked. He said she often took off her clothes and ran around the house naked. On one occasion, he said he was lying naked in bed and she ran and jumped onto the bed and sat on his face. He said that she showered twice a day because she got very dirty. He also said that sometimes he would be showering and she would get into the shower with him. Zimmerman's report included statements from T.F. describing appellant's pubic hair touching her vagina and washing her private area. Although he never admitted or denied licking C.C.'s nipples to Zimmerman, he said he tickled C.C.

Appellant testified that the events described by others either did not happen or were mischaracterized. He admitted showering with T.F., but denied washing her private area. He said she liked showering with him because they would sing and play. She also liked him to wash her hair

9

and dry her off. He denied showering with her at night and then the next morning absent special circumstances, but agreed that she often showered more than once a day because she got dirty. He said that he called T.F. a crybaby once in jest because she was crying after getting shampoo in her eyes. He recalled the incident Zimmerman described in which T.F. jumped on him in bed, but added that he pushed her off of himself and scolded her a little bit because she hurt his neck. He said that, on another occasion when she was preventing him from going to sleep, and he put her on his chest to tell her it was time to go to bed. He denied that either he or T.F. were naked when they slept together, although sometimes she would take off her underwear while wearing a T-shirt. He said that he would tickle her, and that sometimes he would sit her on his chest and that sometimes her T-shirt rode up. He said he did not have much chest hair, and thought that maybe T.F. was talking about her own long hair bothering her. He denied having an erection during any of these events. He explained that he did not like T.F. to sleep in between himself and Ronkartz because T.F. moved around too much; because Ronkartz had a job that required early starts, he chose to bear the brunt of T.F.'s fidgeting.

Appellant testified that Coppedge's son chose not to come out to the farm because he wanted to spend time with his girlfriend. Appellant said he told Coppedge to act like a parent and set the agenda, because otherwise his kids would just watch television. Appellant denied licking C.C.'s nipples and said he told Zimmerman that. He said she might have been confused from when he rubbed an ointment on her chest to help with her respiratory sickness, tickled her, played a game where he surprised her with kisses on various parts of her body, or restrained her when she was having a bad dream in the middle of the night. He thinks that C.C. might not have realized that he

10

restrained her to comfort her from the bad dream or to stop her from thrashing around. He also said that he might have incidentally touched her crotch while they were in bed when he tried to pull her swimsuit bottoms into proper position to avoid having her be embarrassed. He said he also might have incidentally contacted her crotch when lifting her onto a horse. He recalled C.C. trying on the clothes they had just bought and checking to see if they fit. He said he patted her on the butt playfully, like athletes do. He recalled that they failed to buy underwear, but did not remember whether she was wearing a swimsuit as underwear while trying on the clothes. He admitted urinating into a hospital urinal cup in the car at Coppedge's apartment because he had drunk too much coffee. He said C.C. was already out of the car by that time. He said that he was accustomed to urinating in the cup from his days riding motorcycles, and that C.C.'s father did the same when riding motorcycles. He said that he later apologized to C.C. without having a specific reason to do so because he thought she might have been shyer than he had realized, and he felt she might have been embarrassed by the tickling and other games. He admitted that he had pictures of many children, including T.F., on his refrigerator.

**Analysis**

Appellant contends by his sole issue on appeal that the evidence is factually and legally insufficient to support his convictions.

Appellant contends that no evidence supports the finding that he touched T.F.'s genitals. He asserts that T.F. denied on the stand that he touched her privates. But she testified that her private part, which she described as the part of her body used to go pee, touched his belly. Her mother testified that T.F. told her that her private parts touched the hair around appellant's private

11

parts.  Such descriptions have been held sufficient to describe genitalia.  *See Clark v. State*, 558 S.W.2d 887, 889 (Tex. Crim. App. 1977).  Sexual contact is defined as "*any touching* of the anus, breast, or any part of the genitals of another person with intent to arouse or gratify the sexual desire of any person."  Tex. Pen. Code Ann. § 21.01(2) (emphasis added).  There is no limitation on the mode of contact.  Legally and factually sufficient evidence support the finding that he touched T.F.'s genitals.

Appellant contends that there was insufficient evidence to show that he derived any sexual gratification from showering with and washing T.F.  Appellant's intent to arouse or gratify his sexual desire can be inferred from his conduct, his remarks, and all surrounding circumstances.  *See McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. 1981).  He points to T.F.'s testimony that she needed help bathing and the absence of testimony from her that he had an erection.  He dismisses Ronkartz's testimony that she saw him come out of the bathroom with an erection as the testimony of his "bitter ex-wife."  The jury had ample opportunity to observe the witnesses, including T.F., appellant, and Ronkartz.  Ronkartz testified about how she felt controlled by and afraid of appellant, but she also testified that she got a fair settlement in the divorce.  Her testimony that he had an erection after showering with T.F. supplies legally and factually sufficient evidence for the jury to conclude that he was sexually aroused and gratified by exposing his genitals while knowing that a child was present.

Appellant contends that the evidence is factually insufficient to support the finding that he licked C.C.'s nipples or touched her genitals.  He denied doing either, but conceded that there might have been accidental touching or actions that C.C. confused with such touching.  Although

12

C.C. did not know the word for nipple, she repeatedly testified that appellant licked her breast area. She also testified that he grabbed her genitals and would not stop. The jury had to choose between these versions of events. Legally and factually sufficient evidence supports their choice to believe that appellant touched C.C.'s breasts and genitals with the requisite intent.

Appellant contends that the evidence is legally and factually insufficient to convict him for exposing his genitals with the intent to arouse or gratify his sexual desire. He explained that he needed to urinate, that he was accustomed to doing so in the urinal cup from his days riding motorcycles, that C.C.'s father did the same, and that C.C. did not see his penis. Even C.C. testified that she looked away. But she also testified that appellant would not let her out of the car until he finished urinating. This Court has concluded previously that the child is not required to see the defendant's penis to support a conviction for indecency by exposure:

> As defined by the statute, the offense is based on the accused's actions and intent, not the victim's comprehension. Accordingly, the State need only prove that the defendant's genitals were exposed to the victim, not that they were actually seen by the victim. . . . While there must be sufficient evidence that the defendant's genitals were exposed, that evidence need not come from the victim.

*Wilson v. State*, 9 S.W.3d 852, 856 (Tex. App.—Austin 2000, no pet.) (citation omitted); *see also Uribe v. State*, 7 S.W.3d 294, 296-97 (Tex. App.—Austin 1999, pet. ref'd). There is evidence from which the jury could have inferred that appellant never exposed his genitals and that he lacked the requisite intent. But the jury could also determine that appellant necessarily exposed his genitals at some point while urinating. The jury could view his refusal to let her leave the car as evidence of the requisite intent. The evidence is legally and factually sufficient to support their finding.

13

**Conclusion**

Having concluded that the evidence and the reasonable inferences drawn therefrom provide legally and factually sufficient support to the jury's findings on all four counts, we affirm the judgment.

_____

Mack Kidd, Justice

Before Justices Kidd, Patterson and Puryear

Affirmed

Filed:   August 26, 2004

Do Not Publish